**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-00274-CMA

IN RE: HEALTHTRIO, INC.,

---

DAVID E. LEWIS, TRUSTEE,

      Appellant,

v.

DENNIS W. SCRUGGS,

      Appellee.

---

## ORDER REVERSING BANKRUPTCY COURT'S ORDER

---

This matter is before the Court on Chapter 7 Trustee David E. Lewis's ("the Trustee") appeal of the Bankruptcy Court's Order, entered on January 24, 2018, in case No. 09-34404. Dennis W. Scruggs ("Respondent") opposes the appeal. The Court has jurisdiction under 28 U.S.C. § 158(a)(1). For the following reasons, the Order of the Bankruptcy Court is reversed.

## I.    QUESTIONS PRESENTED

The Bankruptcy Court awarded two claims in favor of Respondent, which form the basis of the instant appeal. Accordingly, the Court will consider:

1. Whether the Bankruptcy Court erred when, pursuant to 11 U.S.C. § 502(f), it compensated Respondent for services Respondent provided to Debtor HT Inc. during the gap period; and

2. Whether the Bankruptcy Court erred when it allowed, in this Chapter 7 case, Respondent's substantial contribution administrative claim pursuant to 11 U.S.C. § 503(b)(3)(D).

## II. BACKGROUND[1]

The Debtor in this case is Health Trio Inc. ("Debtor HT Inc.") which developed and licensed software used by health insurance companies to administer claims. "Over the years," however, Dr. Malik Hasan, the founder and majority shareholder of Debtor HT Inc., "engaged in a scheme to manipulate HT Inc.'s assets and defraud creditors." (Rec. at 585.) Between 2000 and 2005, Hasan made cash contributions in the approximate amount of $16.8 million to Debtor HT Inc. None of these contributions were approved by the Board of Directors of Debtor HT Inc., nor did Hasan obtain any collateral to secure repayment of these funds. Nonetheless, at a December 2005 board meeting, the Board approved the issuance of promissory notes and a security agreement, which pledged all of Debtor HT Inc.'s assets as collateral to secure repayment of all of Hasan's monetary contributions.

Respondent is a certified public accountant who was originally employed as the chief financial officer of Debtor HT Inc. Respondent began his employment in July 2004, and his salary was $122,500 per year. His duties from July 2004 through February 2009 included "managing cash receipts and disbursements, performing financial and tax

_____

[1] The following facts are taken from the Bankruptcy Court's January 24, 2018 Order (Rec. at 585–97) unless otherwise noted. Citations to the initial record filed on March 5, 2018, will be denoted as (Rec.). Citations to the supplemental record filed on March 12, 2018, will be denoted as (Supp. Rec.).

accounting and reporting, managing Debtor HT Inc.'s contracts and routinely interfacing with attorneys on Debtor HT Inc.'s litigation." (*Id*. at 586.) Respondent signed the promissory notes and the security agreement as an officer of Debtor HT Inc.

In 2007, Immedient Corporation—one of the three petitioning creditors against Debtor HT Inc.—obtained a judgment against Debtor HT Inc. Subsequently, Hasan demanded to be repaid for the contributions he had made to Debtor HT Inc. Hasan sued Debtor HT Inc. on the security agreement and promissory notes, and Debtor HT Inc. did not defend itself in the lawsuit. Accordingly, Hasan obtained a default judgment in the amount of $21.79 million. Respondent signed both an affidavit in support of Hasan's judgment and an assignment of assets to Hasan, and Debtor HT Inc. surrendered all of its assets to Hasan. "When questioned about signing the insider foreclosure documents, [Respondent] testified he was an accountant, not a lawyer, and as an employee of HT Inc., he did what he was told." (*Id*. at 587.) Thereafter, Hasan formed a new entity called Health Trio LLC ("HT LLC").

Hasan purchased Debtor HT Inc.'s assets at a foreclosure sale and transferred the assets and Debtor HT Inc.'s business to HT LLC.

> Most of HT Inc.'s employees began working for HT LLC as of October 1, 2007, including [Respondent] as CFO. HT LLC operated the exact same business as HT Inc. [Respondent] testified he was never terminated and never resigned as CFO of HT Inc. and that he was the only officer of HT Inc. after August 2007. . . . [Respondent] was hired by Hasan as HT LLC's CFO from October 1, 2007 until January 2010, at the same salary he was paid by HT Inc.

(*Id*.) Thus, Respondent testified that he had two CFO positions from October 2007[2] (Supp. Rec. at 116) until January 2010: one for HT LLC at his regular salary and one for HT Inc. "for which he was not compensated." (Rec. at 587.)

Respondent testified that he "became concerned about his potential liability and future due to the involuntary petition litigation." (*Id*.) As a result, Respondent sought, *inter alia*, an indemnification agreement from Hasan regarding Respondent's activities as an officer, director, and shareholder of Debtor HT Inc. Respondent further testified that, when Hasan refused Respondent's requests, he resigned from his paid position at HT LLC—but not his unpaid position at Debtor HT Inc.—in January 2010. The Court notes that Respondent's resignation from HT LLC did not occur until more than ten months after the involuntary Chapter 7 petition was filed against Debtor HT Inc. The Court also notes that during the gap period, even after he resigned his CFO position at HT LLC, Respondent continued to collect revenues received by Debtor HT Inc. which he delivered to Hasan, resisted the involuntary petition, and helped conceal the fact that Debtor HT Inc. had ceased operations in 2007.

The gap period between the time the involuntary petition was filed and the entry of the order for relief lasted from February 18, 2009, until May 5, 2012. Respondent

---

[2] The Bankruptcy Court's Order indicates that Respondent "testified he had two CFO positions from **February 18, 2009 through January 2010**." (Rec. at 587) (emphasis added). However, the record indicates that on direct examination, Respondent was asked the following question: "Were you performing any tasks for [HT] Inc. that were separate and apart from what you were doing for [HT] LLC during this **2007–2009 timeframe**?" (Supp. Rec. at 116) (emphasis added). In response, Respondent stated: "Yes, I essentially had two jobs, two sets of books, two sets of contracts and so I was essentially doing two jobs at the same time." (*Id*.) Therefore, the record clearly shows that Respondent had a CFO position with Debtor HT Inc. and separate CFO position with HT LLC starting in October 2007 until he voluntarily resigned from HT LLC in January 2010. (Rec. at 587.)

testified that, after he resigned his paid position with HT LLC in January 2010, "he remained CFO of HT Inc. during and after the Gap Period until the Trustee was appointed in December 2012." (*Id*. at 588.) Respondent asserts:

> The ordinary course of business or financial affairs of HT Inc. during the Gap Period was to wind down HT Inc.'s operations, and his services as an officer of HT Inc. are compensable as a Gap Period claim. [Respondent] asserts he could have left HT Inc. and let the "chips fall," to the detriment of HT Inc. and ultimately the HT Inc. bankruptcy estate.

(*Id*.) Despite Respondent's admission on cross-examination by the Trustee that "the only benefit to the Debtor [HT Inc.] . . . during this gap period . . . [was] that Dr. Hassan was continuing to receive money on his security interest [which] reduced the amount that was owed to him on the secured claim," (Supp. Rec. at 222), the Bankruptcy Court found that Respondent "provided routine CFO services to HT Inc. in the Gap Period . . . for the benefit of HT Inc. . . . .", and awarded Respondent $46,959.[3] (Rec. at 596.)

Additionally, the Bankruptcy Court found that Respondent "provided a substantial contribution to the chapter 7 bankruptcy estate in the post-petition period by conferring an actual, direct and demonstrable benefit to the estate in supporting the trustee's litigation claims." (*Id*.) Specifically, Respondent provided a "six-inch three-ring binder litigation notebook for use in the investigation and prosecution of two adversary proceedings," which ultimately settled for a combined total of $1,225,000. (*Id*. at 589.)

---

[3] The Bankruptcy Court awarded Respondent only 50% of the compensation he sought for the gap period, because Respondent failed to keep records of his time during that period. The Court notes that the compensation rate was based on Respondent's $122,500 annual salary as CFO of HT LLC. However, the evidence indicates that Debtor HT Inc. was essentially a defunct corporation and the only task for Respondent to complete for Debtor HT Inc. was essentially a clerical task of collecting the checks on outstanding contracts which he delivered to Hasan. (Rec. at 588.)

The notebook was a product of Respondent's efforts during the gap period to catalogue, identify, maintain, and preserve documents that could eventually be relevant to subsequent litigation.

> The notebook was a "roadmap" for the Trustee. [Respondent] actively assisted the Trustee's counsel in formulating and prosecuting the . . . complaints [in the adversary proceedings]. The complaints were detailed and comprehensive, containing numerous claims for relief. [Respondent] had frequent meetings, located documents, answered questions, was deposed several times, and responded to e-mails with two sets of litigation counsel retained by the Trustee. He estimated he spent 750 hours in this category after the order for relief.

(*Id*.) Therefore, the Bankruptcy Court awarded Respondent $23,250[4] for making a substantial contribution to the Chapter 7 case as an administrative claim.

On February 2, 2018, the Trustee initiated the instant appeal arguing that the Bankruptcy Court erred in granting Respondent's gap period claim and awarding Respondent funds for his contribution to the Chapter 7 case. Respondent filed a Response (Doc. # 13) on May 11, 2018, and the Trustee filed a Reply (Doc. # 14) on May 23, 2018.

### III.     STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's legal determinations de novo. *See In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010). The Court also reviews de novo mixed questions of law and fact that primarily involve legal issues. *See In re Wes Dor Inc.*, 996 F.2d 237 (10th Cir. 1993). The Bankruptcy Court's factual findings are reviewed for clear error. *See In re Johnson*, 477 B.R. 156, 168 (10th Cir. BAP 2012). If

---

[4] The court's award was for 50% of the time Respondent claimed to have spent because Respondent had not recorded his time.

a "lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to de novo review." *Id.*

In the instant case, there are no disputed factual issues. Therefore, because the Trustee's appeal is premised on his argument that the Bankruptcy Court improperly applied the law, the Court will review the Bankruptcy Court's decision de novo. *In re Chernushin*, 584 B.R. 567, 570 (D. Colo. 2018), *aff'd*, 911 F.3d 1265 (10th Cir. 2018) (citing *In re Baldwin*, 593 F.3d at 1159).

## IV. DISCUSSION

The Trustee raises a number of issues related to the Bankruptcy Court's allowance of the gap period claim under 11 U.S.C. § 502(f) and the Bankruptcy Court's allowance of the administrative expense claim under 11 U.S.C. § 503(b). The Court will consider each claim in turn.

### A. 11 U.S.C. § 502(f) GAP PERIOD CLAIM

Section 502(f) provides:

**(f)** In an involuntary case, a claim **arising in the ordinary course of the debtor's business or financial affairs** after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502 (emphasis added). Therefore, whether a creditor is entitled to a gap claim under § 502(f) depends on whether the claim arose "in the ordinary course of the debtor's business or financial affairs . . . ." *Id.*

The Trustee raises the following issues related to the Bankruptcy Court's allowance of Respondent's gap period claim:

1. whether the Bankruptcy Court erred in construing 11 U.S.C. § 502(f) broadly;

2. whether the Bankruptcy Court erred in holding that Respondent held a gap claim "arising in the ordinary course of the debtor's business or financial affairs" even though the debtor ceased its ordinary business operations over a year before the petition date;

3. whether the Bankruptcy Court erred in holding that that Respondent held a gap period claim even though Respondent's activities during that period included:

   a. resisting the involuntary petition,

   b. concealing the fact that the debtor had ceased operating from counter-parties, and

   c. performing other unusual services; and

4. whether the Bankruptcy Court erred in holding that Respondent held a gap period claim "arising in the ordinary course of the debtor's business or financial affairs" even though Respondent performed some of those activities prior to the petition date without compensation.

(Doc. # 12 at 7.)

The Court concludes that the Bankruptcy Court erred in construing Respondent's § 502(f) claim broadly. In doing so, the Bankruptcy Court stretched the interpretation of a gap period claim to encompass a situation in which the services provided were not in the ordinary course of the debtor's business or financial affairs. Because the other issues raised by the Trustee are so intertwined with the issue of "ordinary course", the Court addresses them all as one.

8

1.    <u>Meaning of Ordinary Course of Business</u>

Courts have noted that little authority exists directly addressing the question of the meaning of "ordinary course of business" in § 502(f). *E.g.*, *In re Hanson Indus., Inc.*, 90 B.R. 405, 413 (Bankr. D. Minn. 1988) (finding "no authority directly on point . . . ."); *accord In re Lappin Elec. Co*, No. 97-26130, 2002 WL 34720012, at *3 (Bankr. E.D. Wis. April 29, 2002); *see Braunstein v. McCabe*, 571 F.3d 108, 124 (1st Cir. 2009) (noting that there is "little law" regarding the meaning of "ordinary course of business"). The Bankruptcy Court endeavored to derive the meaning of the term "ordinary course of business" by examining cases in which other bankruptcy courts either granted or denied a § 502(f) gap period claim. Accordingly, the Bankruptcy Court deduced that such claims "fall into two categories." (Rec. at 591.) Specifically,

> In one category the courts have applied a strict standard and held that attorney's fees and expenses incurred in unsuccessfully defending an involuntary petition do not fall within the scope of a debtor's ordinary course of business or financial affairs. In the other category, the courts have applied a less stringent standard and awarded involuntary gap period claims to employees.

(*Id*.)

The Bankruptcy Court ultimately concluded that the term "['ordinary course of business'] under § 502(f) should be **broadly construed** in protecting creditors and parties who deal with an involuntary debtor." (Rec. at 590–593) (emphasis added).

Although the Bankruptcy Court's functional approach is innovative, the Court respectfully rejects the Bankruptcy Court's broad construction standard. First, the cases cited by the Bankruptcy Court in support of its position do not distinguish between § 502(f) claims based on the "categories" identified by the Bankruptcy Court. *See, e.g.*,

*In re Baab Steel, Inc.*, 495 B.R. 530, 534 (Bankr. D. Colo. 2013). Second, this Court could not find any Circuit Court of Appeals authority supporting the Bankruptcy Court's interpretation. Third, the Tenth Circuit has held that statutory priorities—which include gap claims—are "to be **narrowly construed** [b]ecause the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors." *In re Furr's Supermarkets, Inc.*, 35 9 B.R. 356 (B.A.P. 10th Cir. 2007) (emphasis added) (quoting *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988)) (considering statutory priorities generally). It appears that the Bankruptcy Court, categorized Respondent's 502(f) claim as that of a typical employee and construed § 502(f) broadly so as to encompass Respondent's claim as having been incurred in the ordinary course of HT Inc.'s, business. This was erroneous for the reasons set forth below.

Because this Court is not endorsing the Bankruptcy Court's functional definition of "ordinary course of business," the Court looks to other sources for a means of defining the term. Other courts considering the meaning of the term "ordinary course of business" in § 502(f) have looked to definitions of the term which have developed in other sections of the Bankruptcy Code. *E.g.*, *Hanson Indus.*, 90 B.R. at 413–14 (considering the meaning of the term in the context of 11 U.S.C. §§ 363(b)(1), 547(c)(2)(A)); *In re Lappin*, 2002 WL 34720012, at *3 (considering the term in 11 U.S.C. §§ 363(b–c)(1), 364(a)). Those courts have observed that the term "ordinary course of business" has "developed both a vertical and a horizontal dimension." *In re Lappin*, 2002 WL 34720012, at *3. Accordingly, courts have applied a test for each dimension

that reflects the different points of view of the debtor/trustee and of the creditors. Importantly, the horizontal and vertical tests treat the claims of all creditors equally, allowing all gap claims to be narrowly construed as intended by the Bankruptcy Code. *See In re Amarex*, 853 F.2d at 1530.

The first test is a horizontal dimension—or industry comparison test, and the second is a vertical dimension—or "creditor expectation" test. If both tests[5] are satisfied, the court must conclude that the challenged transaction occurred in the debtor's ordinary course of business. *In re Straightline Invs., Inc.*, 525 F.3d 870, 879 (9th Cir. 2008) (citing *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 705 (9th Cir. 1988)); *see also Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 147 & n.4 (9th Cir. BAP 1988) (stating that "the Ninth Circuit has determined that a transaction which meets both the 'horizontal' and 'vertical' dimension tests is in the ordinary course of business[,]" but "[i]t is unclear whether *Dant & Russell* requires both the 'horizontal' and 'vertical' dimension tests to be satisfied"); *but see In re Media Cent., Inc.*, 115 B.R. 119, 124 (Bankr. E.D. Tenn. 1990) ("If either test or dimension is not satisfied, most likely the disputed transaction is not in

---

[5] The Court notes that in the case, *In re C.W. Mining Company*, 798 F.3d 983 (10th Cir. 2015), the court indicated that the term "ordinary" can vary in terms of its meaning depending on what section of the Bankruptcy Code is at issue. *Id.* at 988 n.3. Therefore, the Court will analyze both the horizontal and vertical dimensions of the term "ordinary course of business" in § 502(f) in order to be analytically comprehensive. The Court further notes, however, that at least one district court has held that because § 502(f) "gives creditors second priority if the debt was incurred 'in the ordinary course of the *debtor's* business or financial affairs,' (emphasis added)," the section "does not seem to require a horizontal review of industry practices." *In re Lappin*, 2002 WL 34720012, at *3. Therefore, an analysis of the vertical dimension alone may be sufficient for purposes of § 502(f).

the ordinary course of business."). In the instant case, Respondent's claim fails both tests.

## 2. Horizontal Test

Under the horizontal test, courts ask "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Braunstein*, 571 F.3d at 124 (1st Cir. 2009) (citing *In re Roth Am. Inc.*, 975 F.2d 949, 953 (3d Cir. 1992)). This analysis is aimed at determining whether the challenged transaction is abnormal or unusual for the industry. *Id*. at 124–25 (citing 3 *Collier on Bankruptcy* ¶ 363.03[1], at 363-25; *Straightline*, 525 F.3d at 881 ("The purpose of the horizontal test is 'to assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors.'") (alteration in original) (quoting *Burlington N. R.R. Co.*, 853 F.2d at 704))).

The Bankruptcy Court acknowledged that Respondent's gap claim was abnormal when it stated, "[u]nbelievably and without precedent, the gap period between the filing of the involuntary petition and entry of the order for relief was more than three and one-half years . . . ." (Rec. at 585.) From the perspective of the industry—software development companies—the challenged transaction is certainly abnormal. Facing mounting liabilities, Debtor HT Inc. dissolved and effectively reorganized as HT LLC. (*Id*. at 587.) Respondent, Debtor HT Inc.'s CFO, stopped receiving payment from Debtor HT Inc. and started receiving the same salary from HT LLC. Nevertheless, Respondent did extra work for Debtor HT Inc. without a corresponding increase in salary. (Supp. Rec. at

116.) This arrangement began before the gap period started and continued after the Chapter 7 petition was filed.

The abnormality reached an apex when Respondent—knowing that his only source of compensation was coming from HT LLC—resigned his position from HT LLC. Respondent's principle reason for his resignation was equally unusual. Respondent threatened to resign from HT LLC unless he received an indemnification agreement insulating him from liability for his actions as an officer of Debtor HT Inc. When his demand was refused, Respondent resigned from HT LLC. Nevertheless, Respondent maintained his position with Debtor HT Inc. even though that was the same position that caused him so much concern for his personal liability that he gave up his only source of income in an effort to protect himself. Although the services that Respondent provided for Debtor HT Inc. throughout the gap period may seem facially usual for a company winding up its affairs, the label "usual" is not justified when Respondent's services are viewed in the above-described context.

Whether considered from the perspective of a software development company, in particular, or from a corporate entity, in general, the "transaction" between Respondent and Debtor HT Inc. is not "of the sort commonly undertaken by companies in that industry." *Braunstein*, 571 F.3d at 124 (citing *In re Roth Am.*, 975 F.2d at 953).

    3.   <u>Vertical Test</u>

Under the vertical test, courts analyze the challenged transaction from a hypothetical creditor's point of view and ask whether it "subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit."

*Braunstein*, 571 F.3d at 125 (citing *Straightline*, 525 F.3d at 879 (quoting *Burlington N. R.R. Co.*, 853 F.2d at 705) (internal quotation mark omitted)). In other words, "is the claim so unusual that an ordinary trade creditor would not expect the debtor to be engaging in such a transaction?" *In re Lappin*, 2002 WL 34720012, at *3. "The primary focus . . . is on the debtor's pre-petition business practices and conduct," though a court must be aware of changing circumstances. *Braunstein*, 571 F.3d at 125 (quoting *In re Roth Am.*, 975 F.2d at 953). "The question the creditor expectation test asks is not whether a transaction is unexpected, but whether the transaction is ordinary within the context of the debtor/creditor relationship." *Id*. (citing *Straightline*, 525 F.3d at 881).

In the instant case, the transactions between Respondent and Debtor HT Inc. during the gap period were not ordinary within the context of the debtor/creditor relationship. Respondent is not the "ordinary" third party creditor or low-level employee who continued to work because he was unaware that HT Inc. was in financial difficulty. As the CFO for HT Inc., not only was Respondent an insider, but also, he was an insider who was complicit in the transfer of all of HT Inc. assets to Hasan. He was well aware that, at the time the involuntary petition was filed, HT Inc. was for the most part a defunct shell. Respondent, knew that HT Inc. was non-operational because all of its assets had been transferred to Hasan, thus, any expectation he had of receiving compensation for these services during the gap period was not a reasonable expectation. Additionally, the services Respondent provided to Debtor HT Inc. were qualitatively different from the services he had provided when Debtor HT Inc. was engaged in ordinary business affairs. For instance, although Respondent administered

Debtor HT Inc.'s non-assignable contracts before and after the petition, after Hasan foreclosed on his security agreements and promissory notes—which was facilitated in part by Respondent—the money Respondent collected on behalf of Debtor HT Inc. never was received directly by Debtor HT Inc. (Supp. Rec. at 116–17.) In fact, the money went directly to Hasan's personal bank account because Debtor HT Inc. ceased to operate a bank account. (*Id*.)

During cross examination, counsel for the Trustee asked Respondent the following with respect to the non-assignable Debtor HT Inc. contracts that Respondent administered:

> Q: Okay. And then again, the only benefit to the Debtor [HT Inc.] . . . during this gap period as you would say, if there's any benefit at all it's simply that Dr. Hassan was continuing to receive money on his security interest and reduced the amount that was owed to him on the secured claim, right?
>
> A: That's the end result of what happened, yes.

(Supp. Rec. at 222.) Accordingly, Respondent was working primarily for the personal benefit of Hasan rather than Debtor HT Inc. or its shareholders during the gap period, which stands in stark contrast to the services Respondent performed during Debtor HT Inc.'s ordinary course of business.

Additionally, there were significant changes in Respondent's relationship with Debtor HT Inc. during the gap period. The gap period between the time the involuntary petition was filed and the entry of the order for relief lasted from February 18, 2009, until May 5, 2012. Respondent seeks compensation for his services to Debtor HT Inc. for the entire gap period despite the fact that he continued to receive his full compensation from HT LLC from February 18, 2009, until January 2010, when he resigned his position

at HT LLC. There is no evidence that Respondent entered into an agreement with Debtor HT Inc. to be compensated for the services he provided during the gap period.[6] Respondent held himself out as "an uncompensated officer and employee solely for the purposes of winding up any affairs of HealthTrio, Inc. in an orderly manner." (Doc. # 12-1.) As such, there is no evidence that Respondent had a justified expectation of payment from Debtor HT Inc. for his services. From the perspective of the Debtor HT Inc., as well as a hypothetical creditor, therefore, Respondent voluntarily performed services for Debtor HT Inc. for free.

Respondent's status as a non-compensated service provider contrasts significantly with his relationship with Debtor HT Inc. during HT Inc's ordinary course of business. Specifically, Respondent's relationship with Debtor HT Inc. during the gap period was abnormal relative to their pre-petition relationship because Respondent (1) was not a traditionally compensated employee of Debtor HT Inc. and (2) was not being compensated by HT LLC for the services he performed related to Debtor HT Inc. as of

---

[6] Respondent asserts that he "had an enforceable and valid employment agreement with the Debtor [HT Inc.] during the Gap Period, . . . and the retention of him as an employee during the shutdown and winding up period is not only necessitated by fiduciary duties but also by his employment agreement." (Doc. # 13 at 21.) However, the document—which Respondent claims to be an employment agreement—expressly states that it "is not an employment contract and does not create a binding agreement; you [Respondent] are considered to be hired on an 'at will basis.'" (Doc. # 14-1 at 1.) The document further indicates that Respondent's status as an "at will" employee "means that either of us is free to terminate our employment relationship at any time, with or without cause. [HT Inc.] reserves the right to modify the above provisions at any time . . . ." It appears that Respondent's employment was, in fact, modified when Respondent stopped being paid by Debtor HT Inc., started working for HT LLC, and began receiving his salary from HT LLC. Therefore, Respondent's argument that he was bound by contract to work for Debtor HT Inc. during the gap period is dubious at best. Moreover, the terms of the document do not appear to justify a reasonable expectation of payment after Respondent stopped working full-time for, and receiving a paycheck from, Debtor HT Inc.

2010. In fact, the only way in which Respondent's relationship with Debtor HT Inc. was ordinary relative to their pre-petition relationship was that Respondent performed services for Debtor HT Inc. without a justifiable expectation of compensation from Debtor HT Inc. beginning in 2007 when Debtor HT Inc. ceased its ordinary business affairs, and he continued to do so throughout the gap period.

In sum, the Court concludes that the services Respondent performed were not "ordinary" according to the horizontal and vertical tests. Therefore, those services were not performed "in the ordinary course of business" for purposes of § 502(f). *Braunstein*, 571 F.3d at 125. Accordingly, Respondent's gap period claim must be denied.

**B.    11 U.S.C. § 503(b) ADMINISTRATIVE EXPENSE CLAIM**

Section 503(b) provides, in pertinent part:

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, **including**— . . .

> **(3)** the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by- . . .
>
> > **(D)** a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case **under chapter 9 or 11 of this title** . . . .

11 U.S.C. § 503 (emphasis added).

Despite the fact that the language of § 503(b) expressly states that it applies only to Chapters 9 and 11, there is a split in authority regarding whether § 503(b) applies to Chapter 7 cases. The majority view is that the statute should be read narrowly and,

therefore, substantial contribution claims in Chapter 7 cases are impermissible.

*See, e.g.*, *In re Lloyd Sec., Inc.*, 75 F.3d 853, 857 (3d Cir. 1996). The minority view is

that the word "including" in § 503(b) means that an expansive interpretation of the

statute is warranted and, therefore, substantial contribution claims should be allowed in

Chapter 7 cases. *See, e.g.*, *In re Connolly N. Am., LLC*, 802 F.3d 810, 816–818 (6th

Cir. 2015). The Bankruptcy Court endorsed the minority view.

The Trustee raises the following issues related to the Bankruptcy Court's

allowance of an administrative substantial contribution claim in a Chapter 7 case:

1. whether the Bankruptcy Court erred by *sua sponte* allowing Respondent a claim under § 503(b) even though the statute requires that such claims may only be allowed after notice and a hearing;

2. whether the Bankruptcy Court erred by allowing Respondent a claim under § 503(b) even though Respondent never asked the Trustee for compensation and never filed a request for allowance as required by the statue; and

3. whether the Bankruptcy Court erred in allowing Respondent a claim under § 503(b) for a "substantial contribution" in the Chapter 7 case when the statute explicitly applies to only Chapters 9 and 11.

(Doc. # 12 at 3.)

When interpreting the Bankruptcy Code, courts begin their inquiry with the

language of the statute itself—if the statute's language is plain and unambiguous, the

court's function is to enforce it as written. *In re Cowen*, 849 F.3d 943, 949 (10th Cir.

2017); *accord In re Escalera Res. Co.*, 563 B.R. 336, 346 (Bankr. D. Colo. 2017)

(explaining that courts give undefined terms their ordinary meaning). If, after engaging

in this textual analysis, "the terms of the statute are clear and unambiguous, they are

controlling absent rare and exceptional circumstances." *S. Ute Indian Tribe v. Sebelius*,

657 F.3d 1071, 1078 (10th Cir. 2011). Specifically, courts should not apply the plain language of the statute in a way that leads to an absurd result. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). On the other hand, courts should not enforce a statute as written if "the plain language would 'produce a result demonstrably at odds with the intention of its drafters[.]'" *United States v. Dahda*, 853 F.3d 1101, 1113 (10th Cir. 2017) (ellipses omitted) (quoting *Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 820 (10th Cir. 1995)). However, courts must use caution when deducing congressional intent.

Courts should not decide "what the legislature meant . . . [but] only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). More recently the Supreme Court explained: "in interpreting a statute a court should always turn first to one, cardinal canon, before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). In short, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

Turning to the statutory text at issue, § 503(b) provides that compensable administrative expenses include expenses related to specific activities. The Bankruptcy Code's Rules of Construction expressly state that the words "'includes' and 'including' are not limiting". 11 U.S.C. § 102(3). Based on this language, the specified activities listed under § 503(b)—such as necessary costs of preserving the estate, compensation

and reimbursement under § 330(a), etc.—are not the only activities which may qualify as compensable administrative expenses. *E.g.*, *In re United Educ. and Software*, No. BAP CC-05-1067-MAMEP, 2005 WL 6960237, at *1 (B.A.P. 9th Cir. Oct. 7, 2005); *U.S. Trustee v. Farm Credit Bank of Omaha (In re Peterson)*, 152 B.R. 612 (D.S.D. 1993).

With respect to expenses incurred in making a substantial contribution, Section 503(b)(3)(D) specifically limits recovery to those incurred by "a creditor, . . . in making a substantial contribution in a case under chapter 9 or 11 of this title". Chapters 7, 12, and 13 are all excluded from this provision.

Based on the plain language of the statute and the absence of any ambiguity, this Court agrees with the majority view that:

> it would be unreasonable to apply a section 503(b)(3)(D) analysis to Chapter 7 and create an administrative expense category in Chapter 7 cases based on "substantial contribution." Congress knew how to create a "substantial contribution" administrative expense for cases it believed were appropriate for that benefit. It did that in section 503(b)(3)(D) for Chapter 9 and Chapter 11 cases. It could have done the same in Chapter 7 cases. It did not. As Justice Harry A. Blackmun wrote for the Court in *Russello v. United States*, 464 U.S. 16, 23. . . (1983), "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Id.* at 23. To paraphrase that quotation in the context of the current case, "**Had Congress intended to [accord administrative expense priority to the fees and expenses incurred by a creditor in making a substantial contribution in a Chapter 7 case], it presumably would have done so expressly as it did [for Chapter 9 and Chapter 11 cases** in section 503(b)(3)(D)]." *Id.*

*In re Hackney*, 351 B.R. 179, 201 (Bankr. N.D. Ala. 2006) (emphasis added) (citations omitted).

Moreover, when statutes provide specificity, the specific should govern the general. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). This is particularly true where, as here, Congress has enacted a comprehensive statutory scheme. *Id.* In the context of § 503(b)(3)(D), "the general authorization provided by the expansive term 'including' is limited by the specific authorization of the phrase 'in a case under chapter 9 or 11 of this title.'" *In re Enloe*, No. 14-36358, 2016 WL 4595921, at *3 (Bankr. S.D. Tex. Sept. 1, 2016). The Court "will not render the specific authorization superfluous by allowing the general to control." *Id*.

The minority rule allowing substantial contribution claims in Chapter 7 cases, by contrast, "seems driven more by 'practical considerations,' and 'policy considerations,' than a faithful adherence to the text." *Cowen*, 849 F.3d at 948–49 (internal citations omitted) (quoting *Thompson v. Gen. Motors Acceptance Corp.*, 566 F.3d 699, 703 (7th Cir. 2009); *Weber v. SEFCU (In re Weber)*; 719 F.3d 72, 81 (2d Cir. 2013)). Therefore, because absurd results do not follow from application of § 503(b)(3)(D) as it is written and because that application is not clearly at odds with the intention of the drafters, this Court is bound to enforce the statute according to its plain language. *Id*.

Based on the plain language of the statute, this Court concludes that the Bankruptcy Court erred in allowing Respondent's administrative claim based on § 503(b)(3)(D) in this Chapter 7 case.[7] Accordingly, the Court need not address the remaining issues asserted by the Trustee.

---

[7] Respondent's argument that his administrative claim could have been properly supported by § 503(b)(1)(A) is unavailing. A claim under § 503(b)(1)(A) requires proof of a transaction between the creditor and either the trustee or the debtor. *In re Amarex*, 853 F.2d 1526, 1530

# V.    **CONCLUSION**

For the foregoing reasons, the Bankruptcy Court's allowance of Respondent's gap period claim under 11 U.S.C. § 502(f) and Respondent's administrative claim under 11 U.S.C. § 503(b) is REVERSED. The matter is REMANDED to the Bankruptcy Court for proceedings consistent with this order.


DATED: March 31, 2019

BY THE COURT:

_____

CHRISTINE M. ARGUELLO
United States District Judge

---

(10th Cir. 1988) (citation omitted). Alternatively, a creditor can sustain a claim with evidence that the debtor induced the creditor to perform. *See id*. (citation omitted). However, there is no evidence of a transaction between the Trustee and Respondent; nor is there evidence that Respondent was induced into assisting the Trustee. "No doubt Trustee and the estate benefitted from [Respondent's] expertise . . . . [Respondent] freely provided [it], however." *In re United Educ. & Software*, No. BAP CC-05-1067-MAMEP, 2005 WL 6960237, at *8 (B.A.P. 9th Cir. Oct. 7, 2005) ("The Code does not incorporate state law theories of *quantum meruit*." (citation omitted)).